

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 50412 | **DATE** | 11/27/2001 |
| **CASE TITLE** | Quilling vs. National City Bank of Michigan/Illinois | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Cross-motions for summary judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   For the reasons stated on the attached Memorandum Opinion and Order, plaintiff's motion for summary judgment is denied and defendant's motion for summary judgment is granted. This case is hereby dismissed in its entirety.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | **Document Number** |
| X | Notices mailed by judge's staff. | | NOV 27 2001 | | |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | docketing deputy initials | | |
| X | Mail AO 450 form. | | | 11-27-01 | |
| X | Copy to judge/magistrate judge. ✓ | | date mailed notice | | |
| /LC | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials | |

DOCKETED

NOV 27 2001

MICHAEL J. QUILLING, Receiver for )
Lennox Investment Group, Ltd., )
)
        Plaintiff, )
)
  v. )  No. 99 C 50412
)
NATIONAL CITY BANK OF MICHIGAN/ )
ILLINOIS, f/k/a First of America )
Bank-Illinois, N.A., )
)
        Defendant. )

### MEMORANDUM OPINION AND ORDER

### I.  INTRODUCTION

Plaintiff, Michael J. Quilling, as the receiver for Lennox
Investment Group, Ltd. ("Lennox"), has filed a four-count
complaint against defendant, National City Bank of
Michigan/Illinois, formerly known as First of America Bank-
Illinois ("National City"). The four counts include claims for
negligence (Count I), breach of contract (Count II), aiding and
abetting corporate waste (Count III), and aiding and abetting the
breach of a fiduciary duty (Count IV). As Quilling is a citizen
of Texas, National City is an Illinois corporation with its
principal place of business in either Illinois or Michigan, and
the amount in controversy exceeds $75,000, diversity jurisdiction
is proper under 28 U.S.C. § 1332. Quilling's statutory authority
to file suit here as a receiver is premised on 28 U.S.C. § 754.

Venue is proper in this district and division because National City resides here. See id. § 1391(a)(1). Before the court are Quilling's and National City's cross-motions for summary judgment, filed pursuant to Federal Rule of Civil Procedure 56.[1]

## II.  **BACKGROUND**

In 1996, Randall Law, the president of Lennox, got together with Frank Peitz, who was the president of a company by the name of Active International, Inc. ("Active"), to have Peitz manage a so-called "high yield trading program." (National City LR 56.1(a) ¶¶ 7, 15, 41; Quilling LR 56.1(a) ¶¶ 7-8) The "program" essentially required Lennox to collect funds from individual investors, deposit them into a specified bank account at a National City branch office in Chicago, Illinois, and then turn the money over to Active for Peitz to invest. (National City LR 56.1(a) ¶ 16; Def. Exh. A, Law dep., pp. 24-25) The expectation, of course, was that the "program" would produce high returns, somewhere in the neighborhood of 150% per week for forty weeks, to be split up between Lennox and its investors. (Def. Exh. A, Law dep., pp. 26-27)

Under a "Secured Investment Program Agreement" Law and Peitz

---

[1]  While National City has moved for summary judgment as to all four counts, Quilling has done so only as to Counts I, III, and IV. This is presumably because, in his response brief to National City's motion, Quilling affirmatively disclaims any interest in pursuing his breach of contract claim. (Pl. Resp., pp. 15-16). For that reason, the court grants National City's motion on Count II.

signed on behalf of their respective companies to put the program in place, Active was responsible for opening the National City account in Lennox's corporate name. (National City LR 56.1(a) ¶ 17) Apart from this agreement, Law also gave Peitz authority to appoint agents for Lennox, including those necessary to open the bank account at National City. (National City LR 56.1(a) ¶ 40) Pursuant to that authority, Peitz asked Daniel Benson, a business associate of his, to open the Lennox account. (Id. ¶¶ 22-23; Quilling LR 56.1(a) ¶¶ 9, 24) On June 7, 1996, Benson, along with Peter Loutos, an attorney who worked for Peitz and Active and who also did some work for Benson, went to National City's branch in Park Ridge, Illinois, to set up the bank account for Lennox. (National City LR 56.1(a) ¶¶ 47, 60, 71, 77; Quilling LR 56.1(a) ¶¶ 10, 25)

While the account was initially titled the "Lennox Investment Group, Ltd. Escrow Account," it was understood by Benson, Loutos, Peitz, and Law alike that National City did not "do escrow accounts" in the sense that it would not serve as an escrow agent or assume any fiduciary responsibilities as such over the funds in the Lennox account. (National City LR 56.1(a) ¶¶ 82, 90, 92, 95-97; Quilling LR 56.1(a) ¶¶ 31-32) Rather, National City allowed its customers to call an account an "escrow account" if they wished either for their own convenience – e.g., to keep certain funds segregated – or where the customer acted as the escrow agent. (National City LR 56.1(a) ¶¶ 83, 87, 91, 93,

95; Quilling LR 56.1(a) ¶ 31)  Law apparently believed the Lennox account at National City was the latter, with Benson and Loutos serving as the escrow agents, although he admits no escrow agreement was ever drafted to cover the Lennox account. (National City LR 56.1(a) ¶¶ 59, 118-20)  Thus, despite its title, the Lennox account was in reality an ordinary demand deposit account.  (Id. ¶ 84, 88).  Benson and Loutos were the only two signatories listed on the account (at least until Loutos removed himself a few months later).  (Id. ¶ 94; Quilling LR 56.1(a) ¶ 32; Def. Exh. P, Deposit Account Signature Card)

In the meantime, Lennox was busy soliciting prospective investors.  To participate in the "high yield trading program," individual investors signed a "Financial Lease Agreement," according to which they agreed to "lease" their funds to Lennox. As "consideration" for doing so, Lennox promised to pay the investors 122.5% of the leased funds per week for forty weeks. (National City LR 56.1(a) ¶ 24; Quilling LR 56.1(a) ¶ 12)  The agreement also instructed the investors to wire transfer their funds directly to the Lennox "Escrow/Safekeeping Account" at National City.  (National City LR 56.1(a) ¶ 26)  Once the funds were placed in the account, they were not supposed to be touched until certain conditions were met.  (Id.; Quilling LR 56.1(a) ¶ 16)  Between June and October 1996, various individual investors poured approximately $11.1 million into the Lennox account in this fashion.  (National City LR 56.1(a) ¶ 29)  The parties agree

-4-

these funds were Lennox's sole corporate assets. (Quilling LR 56.1(a) ¶ 15)

The money in the account, however, never made its way into the "high yield trading program." As set out in the Secured Investment Program Agreement, Law granted Peitz power of attorney over the funds in the Lennox account. (National City LR 56.1(a) ¶ 19) It is also undisputed Law signed a corporate resolution on behalf of Lennox on October 26, 1996, made retroactive to April 28, 1996, appointing Peitz Executive Vice-President of Lennox and giving him authority to move funds from Lennox's National City account at Peitz' "sole discretion." (Id. ¶ 20)[2] But rather than invest the money like he was supposed to, Peitz routinely authorized Benson (and, on one occasion, Loutos) to transfer funds out of the Lennox account to pay various individuals and companies having no apparent connection to the trading program. (Id. ¶¶ 116-17) Although it is unclear exactly why Peitz made these payments, one particular transaction needs little explanation. On June 28, 1996, Benson and Peitz, along with two other individuals, bought four luxury automobiles totaling $433,100, on five separate checks drawn against Lennox's National City account, all signed by Benson. (Quilling LR 56.1(a) ¶¶ 46-48; Quilling Exh., Benson dep. Exh. 51)

After receiving a complaint in April 1997 from one of the

---

[2] Quilling challenges the legal effect of this corporate resolution but does not dispute Law in fact passed and signed it.

investors who had transferred money into the account, National City conducted an investigation, filed an interpleader action in the United Stated District Court for the Central District of Illinois, obtained a temporary restraining order to freeze the funds in the Lennox account, and eventually closed the account permanently. (National City LR 56.1(a) ¶¶ 145-47, 153; Def. Exh. W) At that time, the account had just $2473.48 left in it. (Quilling LR 56.1(a) ¶ 63) The Securities and Exchange Commission ("SEC") also caught up with the investment scheme. On June 22, 1998, the SEC filed a complaint in the United States District Court for the Northern District of Texas, Fort Worth Division, against numerous defendants, including Lennox, Active, Law, Peitz, and Benson. (Quilling LR 56.1(a) ¶ 5) That court appointed, and then reappointed, Quilling as the receiver for Lennox.

In the present action, Quilling claims National City negligently handled various aspects of the Lennox account, causing injury to Lennox. For many of the same reasons, Quilling argues National City is guilty of aiding and abetting Benson's breach of his fiduciary duty to Lennox and the looting of Lennox's corporate assets.

### III. **ANALYSIS**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of

material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Rizzo v. Sheahan</u>, 266 F.3d 705, 711 (7th Cir. 2001). With cross-motions for summary judgment, the court views the evidence and draws all reasonable inferences therefrom in favor of the party against whom the motion under consideration is made. <u>See</u> <u>O'Regan v. Arbitration Forums, Inc.</u>, 246 F.3d 975, 983 (7th Cir. 2001). However, only when a reasonable jury could return a verdict for such a party, based on the record as a whole, will there be a "genuine issue for trial." <u>See</u> <u>Chavez v. Illinois State Police</u>, 251 F.3d 612, 635 (7th Cir. 2001). Because the parties have assumed without discussion that Illinois law, rather than the law of some other state, governs their dispute, the court will do the same. <u>See</u> <u>Checkers Eight Ltd. P'ship v. Hawkins</u>, 241 F.3d 558, 560 (7th Cir. 2001).

## A.  <u>Negligence (Count I)</u>

Because he has not been appointed as a receiver for the individual investors, Quilling does not contest he lacks standing to assert any claims on their behalf. <u>See</u> <u>Scholes v. Lehmann</u>, 56 F.3d 750, 753 (7th Cir.), <u>cert. denied sub nom. African Enter., Inc. v. Scholes</u>, 516 U.S. 1028 (1995). It follows that Quilling may not base his negligence action on any duty National City may have owed those investors, but is necessarily limited to National City's duty towards Lennox. As National City's contacts with

-7-

Lennox occurred almost exclusively through Benson, the parties have naturally made this the focus of their discussion. For this very reason, though, Quilling's claim for "negligence" is something of a misnomer.

Quilling concedes, indeed relies on, the fact that Benson acted as Lennox's agent or fiduciary when opening and withdrawing funds from Lennox's account at National City. (National City LR 56.1(a) ¶¶ 57, 58, 69; Pl. Memo., p. 9; Pl. Resp., pp. 18-19) This means the Illinois Fiduciary Obligations Act, 760 ILL. COMP. STAT. 65/1 et seq. ("FOA"), governs Quilling's claims against National City. The FOA generally covers all situations where fiduciaries handle the funds of their principals and limits the liability of persons who deal honestly with another knowing him to be a fiduciary. See County of Macon v. Edgcomb, 654 N.E.2d 598, 601 (Ill. App. Ct. 1995); Hosselton v. First Am. Bank N.A., 608 N.E.2d 630, 633-34 (Ill. App. Ct. 1993). In situations like the present one, it relieves a depository bank of the duty of seeing that funds are properly applied by placing upon the principal the burden to employ honest fiduciaries. See 760 ILL. COMP. STAT. 65/2; Appley v. West, 832 F.2d 1021, 1031 (7th Cir. 1987); Hosselton, 608 N.E.2d at 634. Under the FOA, a bank can be held liable only when it has either actual knowledge of the fiduciary's misappropriation or knowledge of sufficient facts such that its action (or inaction) amounts to bad faith; mere negligence is not enough. See 760 ILL. COMP. STAT. 65/1(2);

_Appley_, 832 F.2d at 1021; _Edgcomb_, 654 N.E.2d at 601.   Although
National City goes too far to say the FOA "preempts" all common
law causes of action in situations covered by the statute (Def.
Resp., p. 3), it does provide a defense to such actions.   See
_Appley_, 832 F.2d at 1031.   But before the court can address
whether National City had "actual knowledge" of Benson's conduct
or acted in "bad faith," it must first take up a few preliminary
matters the parties have raised.[3]

### 1.  **Standing**

National City argues Quilling lacks standing to bring the
present suit because Lennox suffered no injury from the
investment scheme, let alone one caused by National City.   Citing
_Troelstrup v. Index Futures Group, Inc._, 130 F.3d 1274 (7th Cir.
1997), and _Cagan v. West Suburban Bank_, No. 90 C 5582, 1992 WL
80966 (N.D. Ill. Apr. 15, 1992), it reasons Lennox was simply an
"instrumentality" of the fraud, one totally controlled by Law and
Peitz.   As such, National City argues, Lennox could not have been
legally harmed; if anyone was injured, it was the investors, and
Quilling is "really" trying to sue on their behalf.   The Seventh
Circuit, however, has already considered and rejected this same
argument in _Scholes v. Lehmann_, _supra_.   In _Scholes_, a receiver
sued on behalf of various corporations used by an individual,

---

[3]   The court realizes some of these matters apply equally to
all of Quilling's remaining claims, not just the negligence
count, but has inserted its discussion of them here for
organizational purposes.

Douglas, as part of a Ponzi scheme. The fact that the corporations were "Douglas's robotic tools" and received money from "unsuspecting, if perhaps greedy and foolish, investors" mattered not as to the receiver's standing to sue on behalf of those corporations. <u>Scholes</u>, 56 F.3d at 754. The corporations were separate legal entities in the eyes of the law with rights and duties. Once the receiver was appointed, the wrongdoer (Douglas) was removed from the scene and "[t]he corporations were no more Douglas's evil zombies. Freed from his spell they became entitled to the return of the moneys – for the benefit not of Douglas but of innocent investors – that Douglas had made the corporations divert to unauthorized purposes." <u>Id.</u> So too here. The appointment of Quilling as Lennox's receiver removes any taint of Law, Peitz, and Benson being *in pari dilecto* with Lennox, and allows Quilling to press claims against National City on Lennox's behalf. <u>See</u> <u>id.</u>

National City tries to distinguish <u>Scholes</u> and other similar cases on the ground that they all involved a receiver suing individuals or organizations to recover "ill-gotten gains" they had received "from the entity in receivership." (Def. Reply, p. 3). The court, however, does not believe this distinction has any legal significance. Regardless of who the receiver sues, if he does so on behalf of the corporation for damages rightfully belonging to that corporation — whether they be "ill-gotten gains" or compensatory damages for an action at law — then he has

standing to bring that claim. To the extent <u>Cagan</u> suggests

otherwise, the court will not follow that opinion as it provided

only a cursory discussion of the issue and, in any event, this

court is bound to follow the case law of the Seventh Circuit, not

other district courts. The court also finds the facts of

<u>Troelstrup</u> to be inapposite. The receiver in that case was

appointed as a receiver only for the *individual defrauder* — no

corporation or other legally recognized entity was involved. <u>See</u>

<u>Troelstrup</u>, 130 F.3d at 1277. Since the defrauder had no claim

against the defendant, logic dictated the receiver, as a

representative of the defrauder, lacked standing. <u>See</u> <u>id.</u> Such

is clearly not the case here, where Quilling has been appointed

as the receiver of the defrauder's corporation (Lennox), not the

defrauder himself (Law).

### 2. **Economic Loss Doctrine**

Next, relying principally on a single unpublished district

court case from the Northern District of Illinois, <u>Ohio Cas. Ins.</u>

<u>Co. v. Bank One</u>, No. 95 C 6613, 1996 WL 507292, at *9-10 (N.D.

Ill. Sept. 5, 1996), National City claims all of Quilling's tort

actions are barred by the so-called economic loss doctrine, as

articulated in <u>Moorman Mfg. Co. v. National Tank Co.</u>, 435 N.E.2d

443 (Ill. 1982). Unfortunately, the parties did not have the

benefit of the recent Seventh Circuit opinion in <u>Mutual Serv.</u>

<u>Cas. Ins. Co. v. Elizabeth State Bank</u>, 265 F.3d 601 (7th Cir.

2001), which came out shortly after they finished the briefing in

the present case.  The plaintiff in that case sued a bank for allowing an unauthorized signer to withdraw funds from an account.  It originally pleaded both tort and contract theories, but later voluntarily dropped its negligence action, believing it was prohibited by the Moorman doctrine.  The Seventh Circuit, nevertheless, discussed the (in)applicability of Moorman to the plaintiff's tort claim against the bank.  It observed a trend in the Illinois Supreme Court's more recent cases, which suggested a claim for economic loss may be pursued in tort as well as contract where the claim is founded on a duty of care the law imposes on the defendant irrespective of any contract between the parties.  Id. at 617-18 (citing Collins v. Reynard, 607 N.E.2d 1185, 1189 (Ill. 1992) (Miller, J., concurring); Congregation of the Passion, Holy Cross Province v. Touche Ross & Co., 636 N.E.2d 503, 514 (Ill.) ("Where a duty arises outside of the contract, the economic loss doctrine does not prohibit recovery in tort for the negligent breach of that duty."), cert. denied, 513 U.S. 947 (1994)).  Under this rationale, the Seventh Circuit postulated that "a bank's failure to observe ordinary care in handling its customer's transactions may support a tort claim notwithstanding Moorman's commercial loss doctrine."  Elizabeth State Bank, 265 F.3d at 618.  From the premise that the common law duty long imposed on banks to exercise reasonable care is "so entrenched that the [Uniform Commercial Code] does not permit the parties to a banking contract to abandon it," the court reasoned a breach of

that duty would permit a negligence claim, id. at 617-19
(citations omitted), in addition to any breach of contract claim
the customer might have, see id. at 615-17. This court finds
this analysis persuasive and hereby adopts it. It thus concludes
the economic loss doctrine is no bar to Quilling's tort claims.

### 3. **Notice**

Finally, National City argues Lennox's failure to give it
timely notice of the unauthorized withdrawals bars all of
Quilling's claims. Section 4-406(c) of the Uniform Commercial
Code ("UCC"), codified in Illinois at 810 ILL. COMP. STAT. 5/4-
406(c), "places upon a bank's customer the duty of bringing to
the bank's attention any item containing an unauthorized
signature which has been debited to the customer's account."
Euro Motors, Inc. v. Southwest Fin. Bank & Trust Co., 696 N.E.2d
711, 716 (Ill. App. Ct. 1998). The UCC gives the customer one
year to "discover and report" such unauthorized signatures from
the date the bank makes available to the customer a statement of
account; otherwise, the customer is precluded from asserting
those signatures against the bank, without regard to either the
customer's or the bank's lack of care. See Euro Motors, 696
N.E.2d at 716; Watseka First Nat'l Bank v. Horney, 686 N.E.2d
1175, 1178 (Ill. App. Ct. 1997); 810 ILL. COMP. STAT. 5/4-406(f).

The court is at a loss to understand the relevance of § 4-
406 in the present case. As noted above, Benson was an
authorized signatory on Lennox's account at National City and is

-13-

the one who signed most of the transfers and checks to move funds out of the account (with the exception of one by Loutos, who was also a signatory on the account at the time). Quilling's claims thus have nothing at all to do with any "unauthorized signatures." The only thing "unauthorized" about Benson's withdrawals was that they violated the Secured Investment Program Agreement, and what National City apparently has in mind is to apply § 4-406 to all types of unauthorized withdrawals, not just those involving unauthorized signature. The plain language of the statute, however, clearly encompasses only the latter, and National City offers no principled basis to expand the scope of the statute to cover the former. In fact, the two cases it cites where the courts actually applied § 4-406 both involved some sort of unauthorized signatures. See Euro Motors, 696 N.E.2d at 712-13 (checks drawn on corporate account missing a required signature); Reliance Ins. Co. v. Bank of Am. Nat'l Trust & Savings Ass'n, No. 99 C 3366, 2001 WL 62597, at *1 (N.D. Ill. Jan. 25, 2001) (forged signature); accord Wetherill v. Putnam Investments, 122 F.3d 554, 555 (8th Cir. 1997) (forged signature); Watseka, 686 N.E.2d at 1176-77 (forged signature). Because Quilling is not asserting against National City any unauthorized signatures, § 4-406 is simply a non-issue. Cf. Appley, 832 F.2d at 1031-32 (§ 4-406 does not apply where plaintiff's claims "encompasse[d] much more than . . . an unauthorized signature or endorsement or alteration on an item,"

-14-

but also alleged bank breached broader duty by facilitating her fiduciary's scheme to defraud her); Ohio Casualty, 1996 WL 507292, at *6 (§ 4-406 does not apply where plaintiff's claims for conversion against bank did not involve unauthorized signature or alteration).

### 4. **Fiduciary Obligations Act**

With all of that cleared out of the way, the court, at last, turns to the issue of whether Quilling has offered evidence, sufficient to survive summary judgment, of National City's "actual knowledge" or "bad faith" to hold it liable under the FOA. "Actual knowledge" in this context requires a "present awareness that a fiduciary is breaching his duty for personal gain." In re Broadview Lumber, 118 F.3d 1246, 1251 (8th Cir. 1997). "Bad faith" under the FOA means it was "'commercially' unjustifiable . . . to disregard and refuse to learn facts readily available." Appley, 832 F.2d at 1031. In other words, the circumstances and facts must become so "cogent and obvious" that it is bad faith to remain passive when doing so amounts to a "deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a defect in the transaction." Richards v. Platte Valley Bank, 866 F.2d 1576, 1583 (10th Cir. 1989); see also Appley, 832 F.2d at 1031; Edgcomb, 654 N.E.2d at 601. However, mere suspicious circumstances are not enough to trigger a bank's duty to inquire. See Richards, 866 F.2d at 1583; Johnson v. Citizens Nat'l Bank of Decatur, 334 N.E.2d 295,

-15-

300 (Ill. App. Ct. 1975).

Quilling contends the following evidence, when viewed in the light most favorable to him, shows National City had actual knowledge Benson was breaching his fiduciary duties to Lennox or, at a minimum, creates a question of fact as to whether it acted in bad faith in allowing Benson to continue withdrawing funds from the Lennox account. First, he points out that National City did not require Benson to produce proper documentation of his authority to act as an agent or open an account on behalf of Lennox. (Quilling LR 56.1(a) ¶¶ 26, 28) Once the account was set up, National City admits Bruce Slagg, the National City employee assigned to the Lennox account, was aware the funds being deposited into it were coming from various investors. (Id. ¶ 42) Also, when Lennox investors wire transferred their money to the National City account, they included in their instructions that the funds were for deposit into the "Lennox Investment Group, Ltd. Escrow/Safekeeping Account." (Id. ¶ 37) At the same time, National City sent out deposit confirmation letters, signed by Slagg and Audalee Stanton McLoughlin, National City's branch manager, to Benson, Loutos, and Law, which described the account as the "Lennox Investment Group, Ltd. Escrow Account." (Id. ¶¶ 38, 40) Law testified in his deposition this further confirmed in his mind the idea that the account was an escrow account. (Id. ¶¶ 20, 23) In addition, Benson asked National City at some point to provide a bank reference letter with respect to the

Lennox account. It did so but refused to include in the letter the various numbers associated with the individual investors' contracts with Lennox because National City was not privy to those contracts. (Id. ¶¶ 44-45)

Quilling also makes much of a letter faxed by Harold Miller, an attorney for one of the investors, a company by the name of Gerard Equity, Ltd. ("Gerard"), to National City on July 2, 1996. Miller advised National City that Gerard would be transferring $600,000 into the Lennox account and wrote, "These funds are to be held in escrow with your bank and released only in compliance with paragraph 4 of" the Financial Lease Agreement between Gerard and Lennox. Attached to the fax was a copy of the relevant page from the Financial Lease Agreement. (Id. ¶ 50) Slagg forwarded a copy of the letter to Loutos. (Id. ¶ 51) The next day, however, Miller faxed a second letter to National City, instructing it to ignore his letter from the day before as void. (National City LR 56.1(a) ¶ 144) Nevertheless, a few days after that, National City received from Miller a hard copy of his July 2nd letter along with a complete copy of the Financial Lease Agreement. (Quilling LR 56.1(a) ¶ 52)

Finally, Quilling focuses on the four cars bought on June 28, 1996. Benson paid for the cars on five checks written against the Lennox account, made payable to the car dealership. The dealership, however, would not accept these and insisted on a cashier's check. So the dealership's sales manager took Benson's

-17-

checks to National City, where McLoughlin signed a cashier's check in the dealership's name for the amount of $433,100.  (Id. ¶¶ 48-49)

Based on all of this evidence, Quilling essentially argues National City knew the Lennox account was an escrow account into which individual investors were transferring their funds, knew Benson was a fiduciary with respect to the account, knew about the Financial Lease Agreements between Lennox and its investors, and ultimately knew Benson was breaching his fiduciary duty by withdrawing those funds in violation of those agreements.  At the least, Benson says, this evidence shows National City's bad faith in not investigating further.  The court disagrees with both conclusions.

To begin with, the fact that National City did not check into Benson's authority to set up the account proves nothing because Quilling does not dispute Benson in fact had such authority.  So even if National City had demanded proof of Benson's authority to act on Lennox's behalf, it certainly would have been obtained forthwith.  See Bonded Fin. Srvs., Inc. v. European Am. Bank, 838 F.2d 890, 898 (7th Cir. 1988) (bank not liable under FOA for failure to inquire where, even if bank had asked about fiduciary's authority to make a certain transfer, it would have only revealed that corporation wanted the fiduciary to make the transfer).  Also of little help is the fact that investors referred to the Lennox account as an "Escrow/

Safekeeping Account" in their instructions to National City or that National City referred to it as an escrow account in its deposit confirmation letters. Quilling believes this shows National City improperly titled the account, thus giving a false impression to the investors and Law that the account truly was an escrow account, even though it was not. This argument, however, flies in the face of Quilling's admission that Benson and Law understood National City did not "do escrow accounts" in the sense of assuming fiduciary responsibilities over its customers' accounts but that it would allow its customers to call an account an escrow account either for their own convenience of if the customer wanted to act as the escrow agent. Thus, there was nothing suspicious about either the investors or National City calling the account an escrow account because that is exactly what Benson and Law understood it to be — an escrow account with Benson and Loutos serving as the escrow agents.

The "car shopping trip" also proves little because it occurred before Miller's July 2nd letter. For whatever that letter is worth to prove National City's "actual knowledge" about the relationship between Lennox and its investors (more on that below), Quilling has submitted absolutely no evidence that National City had any understanding of the terms of the Financial Lease Agreements *before* Miller sent this letter. In fact, Quilling admits National City was not a party to those contracts. (National City LR 56.1(a) ¶ 31) Moreover, there is no evidence

McLoughlin (as opposed to Slagg) knew, as of June 28, 1996, the funds in the account were coming from individual investors. Thus, the mere fact that Benson wrote out checks to a car dealership against an account McLoughlin may have known was an escrow account (that is, one where the customer was the escrow agent), standing alone, hardly shows she had "actual knowledge" Benson was misappropriating the funds or even that she was deliberately ignoring the true nature of the transaction. "[T]here are many legitimate reasons why an agent and principal might engage in odd checking practices," Johnson, 334 N.E.2d at 300, and writing checks out to a car dealership is not so unusual that McLoughlin acted in bad faith by not investigating it further.

Quilling also contends that, once Slagg received Miller's letter from July 2nd and a copy of the Financial Lease Agreement, he had actual knowledge the funds were not to be released except in compliance with paragraph four of the Financial Lease Agreement. Despite this knowledge, Quilling argues, Slagg allowed Benson to continue withdrawing funds out of the account. The first problem with this theory is that paragraph four of the Financial Lease Agreement (Def. Exh. H ¶ 4) is about as clear as mud. Even Quilling's own expert testified it is "very confusing and convoluted" and would not have made it obvious to National City that Benson was breaching his fiduciary duties by withdrawing funds from the account in violation of the agreement.

(National City LR 56.1(a) ¶ 161; Def. Exh. J, Winston dep., p. 202)  Besides that, there is no evidence Slagg ever actually read the agreement; Quilling himself says "Slagg's only reaction to the letter" was to forward it to Loutos.  (Quilling LR 56.1(a) ¶ 51)  Given the present record before the court, Quilling has failed to produce sufficient evidence from which a reasonable jury could find Slagg had "actual knowledge" that Benson was not supposed to move funds out of the Lennox account until the conditions of the Financial Lease Agreement were met.  The most that can be said of Miller's letter is that it gave Slagg reason to investigate.

But investigate he did.  In fact, Quilling admits Slagg began his own investigation into Benson after receiving Miller's July 2nd letter, and this despite Miller's July 3rd letter, in which Miller effectively rescinded his previous letter.  Within a week of the July 2nd letter, Slagg obtained a credit report on Benson, indicating Benson was "of questionable background." (Quilling LR 56.1(a) ¶¶ 53, 54)  By August 1996, Slagg had become suspicious of the Lennox account and even suspected possible check kiting.  (Id. ¶ 55)  On August 5, 1996, he sent a package of materials regarding the Lennox account to National City's Loss Mitigation Department.  (Id. ¶ 57)  Eventually, National City shut down the account in April 1997 immediately after it received a complaint from Miller about Lennox not returning Gerard's funds.

These are hardly the actions of a bank acting in "bad faith." As soon as the slightest suspicion arose with the first letter from Miller on July 2, 1996, National City began investigating. True, it took nine months and another letter from Miller before National City shut the account down, and Quilling seems to think National City should have done more and acted sooner. For example, he suggests National City should have asked more questions about the account, such as why the investors were sending money to the account, what were the contract numbers on the wire transfer slips and the ones Benson wanted listed on the bank reference letter, what was the purpose of the contracts, and why the auto dealership required a cashier's check. But all of these questions would thwart the very purpose of the FOA, which is to facilitate banking and financial transactions. See Edgcomb, 654 N.E.2d at 601. The inquiries Quilling says National City should have made would "bring the wheels of commerce to a halt." Richards, 866 F.2d at 1583.

More to the point, the circumstances of this case do not indicate National City had actual knowledge Benson was breaching his fiduciary duties to Lennox for his own personal gain. And while some of the facts surrounding the Lennox account may have been suspicious, it cannot be said National City is guilty of deliberately evading knowledge of defective fiduciary transactions. It is undisputed National City did investigate the Lennox account after it received the first letter from Miller in

-22-

July 1996. Moreover, the facts available to National City were not so "cogent or obvious" that its failure to investigate *further* or close the account sooner amounted to bad faith. <u>Cf.</u> <u>id.</u> (court reversed jury verdict for plaintiff and remanded for judgment in favor of defendant-bank where fiduciary deposited check into escrow account and then transferred funds to himself; despite numerous suspicious circumstances surrounding the transactions, bank's failure to investigate did not constitute bad faith).

## B. <u>Aiding and Abetting Corporate Waste and Breach of Fiduciary Duty (Counts III and IV)</u>

Although there is no separate tort of "aiding and abetting," a defendant's aiding and abetting another to commit a tort can be used to impose liability against the defendant for the tort aided and abetted. <u>See</u> <u>Eastern Trading Co. v. Refco, Inc.</u>, 229 F.3d 617, 623 (7th Cir. 2000). In this sense, Quilling says Count IV of his complaint is properly understood as a claim against National City for facilitating Benson's breach of his fiduciary duty to Lennox. (Pl. Memo., p. 8) But this is essentially the same claim the court just analyzed under the FOA. <u>See</u> <u>Appley</u>, 832 F.2d at 1021. The same is also true of Count III, in which Quilling argues National City "acted in concert with" or "substantially assisted" Benson in looting Lennox's corporate assets (<u>i.e.</u>, the funds in the Lennox account). (Pl. Reply, p. 4) No matter what label Quilling attaches to it, this count is,

-23-

like his other claims, based entirely on the theory that National City assisted Benson by allowing him to continue withdrawing funds out of the account. (Pl. Memo., p. 11) Because of Benson's fiduciary status with respect to the Lennox account, both Counts III and IV are subject to the same standards under the FOA as Count I and are likewise dismissed for the same reasons explained above regarding National City's lack of actual knowledge or bad faith.

## IV.   CONCLUSION

For the reasons stated above, Quilling's motion for summary judgment is denied and National City's motion for summary judgment is granted. This case is hereby dismissed in its entirety.

**E N T E R:**

_PHILIP G. REINHARD_
**PHILIP G. REINHARD, JUDGE**
**UNITED STATES DISTRICT COURT**

DATED: _November 27, 2001_

# United States District Court
## Northern District of Illinois
### Western Division

Michael J. Quilling

v.

National City Bank of
Michigan/Illinois

**JUDGMENT IN A CIVIL CASE**

Case Number: 99 C 50412

☐     Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■     Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that plaintiff's motion for summary judgment is denied and defendant's motion for summary judgment is granted. This case is hereby dismissed in its entirety.

All prior orders in this case are now final and appealable.

FILED-WD
01 NOV 27 PM 2:41
CLERK
U.S. DISTRICT COURT

Michael W. Dobbins, Clerk of Court

Date: 11/27/2001

Susan M. Wessman, Deputy Clerk